1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2

3   UNITED STATES OF AMERICA,        Criminal Action
                                     No. 1:07CR43
4          Plaintiff,

5   vs.                             Greensboro, North Carolina
                                    November 7, 2007
6   DANILO QUESADA-GUERRERO,        Pages 1 - 56

7          Defendant.

8   _____/

9                          VOLUME I

10          TRANSCRIPT OF SENTENCING PROCEEDINGS

11        BEFORE THE HONORABLE N. CARLTON TILLEY, JR.

12                 UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Government:     RANDALL GALYON, ESQUIRE
                            Assistant United States Attorney
15                          Post Office Box 1858
                            Greensboro, North Carolina 27402
16

17  For the Defendant:      CHARLES WHITE, ESQUIRE
                            Post Office Box 9518
18                          Greensboro, North Carolina 27401

19
    Court Reporter:         J. Calhoun, RPR
20                          Room 101, U.S. Courthouse Building
                            324 West Market Street
21                          Greensboro, North Carolina 27401
                            (336) 332-6033
22

23
              Proceedings reported by stenotype reporter.
24        Transcript produced by computer-aided transcription.

25

1                           INDEX

2
                      DIRECT    CROSS    REDIRECT    RECROSS
3   WITNESSES FOR THE
    GOVERNMENT:
4
    Det. A. Williams      5         18        20          21
5
    Jeanne Thilo         22
6
    Corporal Gill        26        30        31          31
7
    WITNESSES FOR THE
8   DEFENSE:

9   D. Quesada-Guerrero  32        36        39

10  Det. A. Williams     40        42        43

11

12  EXHIBITS:                                ADMITTED

13
    Government's 1   Tracking Record             14
14

15

16

17

18

19

20

21

22

23

24

25

1                (Defendant is present.)

2                THE COURT:  Ms. Winchester, would you administer the

3      oath to Ms. Bojanini, please.

4                (Interpreter was sworn.)

5                THE COURT:  Mr. Galyon.

6                MR. GALYON:  Good morning, Your Honor.

7                This is United States of America versus Danilo

8      Quesada-Guerrero, 1:07CR43-1.  Your Honor, he's represented by

9      Charles White.  The matter is on for imposition of sentence.

10               Your Honor, with me at counsel table is Tom McKnutt.

11     Mr. McKnutt is a Wake Forest Law School student who is with our

12     office through the clinical program.  He'll be handling one of

13     the witness's direct during the course of the proceedings today.

14               THE COURT:  Glad to have you with us, Mr. McKnutt.

15               MR. MCKNUTT:  Thank you, Your Honor.

16               THE COURT:  Mr. White, Mr. Quesada, have you talked

17     about the presentence report with one another?

18               THE DEFENDANT:  Yes.

19               THE COURT:  Mr. Quesada, the document that looks like

20     this, has that been read to you by an interpreter?

21               THE DEFENDANT:  Yes.

22               THE COURT:  And, did you have the opportunity to talk

23     with Mr. White about that report while you had the services of

24     an interpreter?

25               THE DEFENDANT:  Yes.

1          THE COURT:  Mr. White, tell me about objections.

2          MR. WHITE:  If Your Honor please, they are outlined in

3   the filing we have made with the Court.  I think there are

4   several issues that would have a rather significant impact on

5   the guideline, advisory guideline calculation, most notably, in

6   connection with conduct alleged to have occurred around the time

7   of Mr. Quesada's apprehension.

8          There are several other less serious, if you will,

9   objections, one of which, Judge, is noted with regard to the

10  two-level adjustment in connection with the high-speed chase

11  after which Mr. Quesada was apprehended.  You note the objection

12  indicates there might be double-counting in that circumstance.

13  Upon reviewing the Government's response to that, we realize it

14  is not double-counting and we would withdraw that objection at

15  this point.

16         THE COURT:  So the main objection is with regard to

17  what use may or may not have been made of the firearm at the

18  time of apprehension?

19         MR. WHITE:  Exactly, Your Honor.  There is also a

20  dispute as to quantities involved.

21         THE COURT:  In terms of what was said?

22         MR. WHITE:  And information that may or may not have

23  been made.

24         THE COURT:  What may or may not have been said

25  following his arrest?

1          MR. WHITE:  Correct.

2          THE COURT:  Do you agree with that, Mr. Quesada?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Thank you.  You may be seated.

5          Mr. Galyon, Mr. McKnutt.

6          MR. GALYON:  Your Honor, there would be evidence.  The

7    United States would call Detective Alex Williams.

8          (DETECTIVE ALEX WILLIAMS, GOVERNMENT WITNESS, WAS

9    SWORN.)

10                    DIRECT EXAMINATION

11   BY MR. GALYON:

12   Q.   If you would state your name, please.

13   A.   Alexander W. Williams.

14   Q.   How are you employed, sir?

15   A.   I'm employed with the Greensboro Police Department as a

16   VICE narcotics detective.

17   Q.   How long have you been with the Greensboro Police

18   Department?

19   A.   15 years.

20   Q.   Back in March of 2006, were you involved in an

21   investigation that ultimately led to the arrest of this

22   Defendant, Danilo Quesada-Guerrero?

23   A.   Yes, I was.

24   Q.   As to the involvement of Mr. Guerrero, did you have

25   occasion to conduct surveillance of Mr. Guerrero?

1  A.   Yes, I did.

2  Q.   Were you familiar with the vehicle that he drove?

3  A.   Yes, I was.

4  Q.   What was that vehicle?

5  A.   It was a grayish colored Nissan Titan pickup truck.

6  Q.   And pursuant to a court order, had you installed a GPS

7  tracker on that particular vehicle?

8  A.   Yes, I had.

9  Q.   As part of the ongoing investigation in March of 2006, did

10 you conduct quarries of hotels in Greensboro as to whether or

11 not this Defendant, Mr. Guerrero, had registered hotel rooms in

12 his name?

13 A.   Yes.

14 Q.   And, did you receive responses that he had in fact had

15 hotel rooms in his name?

16 A.   Yes.

17 Q.   Were those hotel rooms rented during the period of time at

18 issue in this particular case, March and early April?

19 A.   Yes.

20 Q.   As part of the surveillance that you conducted, did you see

21 this Defendant with an individual named Francisco Ayala?

22 A.   Yes, I did.

23 Q.   The Court is familiar with Mr. Ayala being a truck driver.

24 If you would, explain very briefly about the issue of the hotel

25 and then also, a trailer and a tractor trailer at Old Liberty

1    Place in Greensboro.

2    A.    Just generally, what occurred is, during surveillance of

3    Mr. Quesada-Guerrero, we observed him drive, I believe it was

4    March 26th, to a trailer park located off of Old Liberty Road

5    out in Guilford County.  At that point, he made contact with

6    three other Hispanic males who were associated with a tractor

7    trailer that was parked just outside on the roadway of the

8    trailer park.

9          After making contact with the subjects, these other

10   subjects were observed to load duffle bags from the tractor

11   trailer and put them into a white Honda.  Once that took place,

12   Mr. Quesada-Guerrero drove away from the trailer park, being

13   followed by the white Honda on that particular occasion.

14          The very next day, I was contacted by another

15   detective with VICE narcotics unit that checks on hotels, and he

16   had run across the white Honda associated -- the subjects being

17   checked into a room there at the Red Carpet Inn on Beasley

18   Street.

19   Q.    And at some point that room at the Red Carpet was

20   registered either in the name of this Defendant or in the name

21   of a codefendant, Mr. Sosa Dominquez?

22   A.    Right.   That's correct.

23   Q.    And did you see Mr. Guerrero actually operating that Nissan

24   Titan during the course of late March and early April, during

25   the investigation?

1    A.    Yes, I did.

2    Q.    Did you see Mr. Sosa Dominquez in his company during any of

3    those occasions?

4    A.    Yes, I did.

5    Q.    And turning your attention to April the 11th of 2006, if

6    you would, just describe briefly what occurred related to a

7    chase of this Defendant during the morning hours.

8    A.    Okay.  On the morning of April 11th, a tractor trailer,

9    which had been the focus of our investigation, had left in the

10   early morning hours of the 11th.  That tractor trailer was

11   subsequently stopped by an interdiction unit with the State

12   Highway Patrol.  After that stop took place and nothing was

13   found in the tractor trailer, the subjects were released.

14          Based upon my training and experience, I felt that the

15   driver of the tractor trailer associated with this

16   investigation, was going to make contact with

17   Mr. Quesada-Guerrero and let him know that the tractor trailer

18   had indeed been stopped.

19          Shortly after the stop of the tractor trailer, we had

20   surveillance on the various locations associated with

21   Mr. Quesada-Guerrero and his associates, and basically made true

22   my beliefs, because we started seeing activity at these

23   locations, with Mr. Quesada-Guerrero in particular, he left from

24   his residence on Hubert Street in the Nissan Titan, drove across

25   town to -- he had another residence where his ex-wife lived on

1    Dexter Avenue.  He drove to the Dexter Avenue area, actually

2    circled that area and then returned to Hubert Street and circled

3    that area again and then responded back to Dexter Avenue.

4            Based on my training and experience, he was looking

5    for the presence of law enforcement.  Ultimately he stopped at

6    and went inside the Dexter Avenue house.

7    Q.   And during the course of that morning, did other

8    individuals arrive at the Dexter Avenue residence?

9    A.   Yes.  And again, with another subject by the last name of

10   Loviana, and we had surveillance on his house, and he drove from

11   his house in pretty much the same fashion, making

12   counter-surveillance type maneuvers, making U-turns in parking

13   lots, which appeared he was trying to detect the presence of law

14   enforcement.

15           Mr. Loviana and Mr. Sosa Dominguez also arrived to the

16   Dexter Avenue residence shortly after Mr. Quesada-Guerrero's

17   arrival.

18   Q.   And during or some time thereafter, did

19   Mr. Quesada-Guerrero, Mr. Loviana and Mr. Sosa Dominguez get in

20   the Titan truck?

21   A.   Yes, they did.

22   Q.   Did you request that a uniformed officer conduct a traffic

23   stop?

24   A.   Yes.

25   Q.   Were they able to actually stop and take this Defendant

Direct Examination - Det. Alex Williams

1  into custody at that point?

2  A.  No, they were not.

3  Q.  At some point did a vehicle pursuit ensue?

4  A.  Yes, it did.

5  Q.  And during the course of that, did you use the information

6  from the tracker to relay to other officers the location of the

7  Titan?

8  A.  Yes, I did.

9  Q.  That tracking device, does it provide information about the

10  speed with which the vehicle was traveling?

11  A.  Yes, it does.

12  Q.  Does it also have a time stamp giving you a time for when

13  those things are occurring?

14  A.  Yes, it does.

15  Q.  As to the chase and your review of the information from the

16  tracking device, did the vehicle speed ever exceed 90 miles an

17  hour?

18  A.  Yes, it did.

19  Q.  Was that while it was in the city limits of Greensboro?

20  A.  Yes, it was.

21  Q.  As to the evidence collection, at some point was the -- did

22  the vehicle wreck?

23  A.  Yes, it did.

24  Q.  And were firearms and drugs located at the scene of the

25  wreck?

1   A.   Yes, they were.

2   Q.   Was Mr. Quesada-Guerrero apprehended on that occasion?

3   A.   Yes, he was.

4   Q.   Do you know where he was apprehended?

5   A.   Somewhere in the immediate neighborhood area, and I

6   could -- just what I heard on the radio about where he was

7   located was underneath a boat.

8   Q.   Were you involved in the evidence collection of any

9   firearms that were associated with Mr. Quesada-Guerrero?

10  A.   Yes.  At the wreck scene.

11  Q.   And then were there also additional firearms that were

12  retrieved from Mr. Guerrero thereafter?

13  A.   Yes, there were.

14  Q.   Did you end up putting those into evidence?

15  A.   Yes, I did.

16  Q.   Was one of those a 38 caliber black Smith and Wesson?

17  A.   That's correct.

18  Q.   The other was a 25 caliber silver Titan firearm; is that

19  correct?

20  A.   That's correct.

21  Q.   After Mr. Guerrero was apprehended, did you Mirandise him?

22  A.   Yes, I did.

23  Q.   Did you have available a Spanish-speaking officer?

24  A.   Yes.  We actually had two who are fluent in Spanish.

25  Q.   Did this Defendant waive his Miranda rights?

Direct Examination - Det. Alex Williams

1   A.   Yes, he did.

2   Q.   And thereafter, did he provide a statement to you?

3   A.   Yes, he did.

4   Q.   What did Mr. Guerrero say about involvement in a drug

5   conspiracy or involvement in what was going on at the trailer

6   there on Old Liberty?

7   A.   He explained to us that that tractor trailer had indeed

8   brought 100 kilos of cocaine to the Greensboro area, and when

9   the tractor trailer left, he said that the payment for 30 kilos

10  of cocaine was located in that tractor trailer.  He told us that

11  he knew that the tractor trailer had been stopped but we had not

12  located the currency.

13  Q.   Did he say who the driver of the tractor trailer was?

14  A.   Yes.  He said he knew him as Francisco.

15  Q.   How did he know that the tractor trailer had been stopped?

16  A.   Through telephone contact.

17  Q.   With who?

18  A.   Francisco.

19  Q.   Did he give you any information about where the hundred

20  kilos had been stored that had been in that tractor trailer?

21  A.   I believe he made mention that they were stored in that --

22  the trailer, in the trailer park, I believe is number 84.

23  Q.   Do you recognize in the courtroom the person that you saw

24  driving the Nissan Titan on various occasions and also that was

25  apprehended with the two firearms on April 11, 2006?

1    A.    Yes, I do.

2    Q.    If you would point him out to the Court.  What does he have

3    on?

4    A.    Orange jumpsuit.

5          MR. WHITE:  We'll stipulate that he's identified the

6    Defendant, Your Honor.

7    BY MR. GALYON:

8    Q.    The information from the tracker is run through a software

9    program that you have on a computer with the Greensboro Police

10   Department; is that correct?

11   A.    That is correct.

12   Q.    And I'll ask if you can identify what you are going to see

13   here on the screen - Your Honor, if I may turnoff this

14   backlight, I think that may assist a little bit.

15         THE COURT:  I'm not sure that that does not control

16   the lights directly overhead.  That, I think, is just for the

17   jury box.

18   BY MR. GALYON:

19   Q.    Can you see?

20   A.    I can see.

21         THE COURT:  You may come down if it's helpful to do

22   that.

23         THE WITNESS:  I think I'll be okay here.

24

25   BY MR. GALYON:

1  Q.   As part of this software, there is a red circle; is that

2  correct?

3  A.   That's correct.

4  Q.   And what is that indicating?

5  A.   This particular track, that's indicating where the Nissan

6  Titan is located, being as you can tell on the right where the

7  address details, the 2800 block of Dexter Avenue.  I'm familiar

8  that that's the Dexter Avenue address where they had left from

9  that morning.

10 Q.   And does this particular track record give you a time and

11 date as well?

12 A.   Yes, it does.  There in the top right-hand corner,

13 April 11, 2006, at 11:04 a.m.

14 Q.   And the tracker that was on the Titan on that occasion, is

15 basically -- it's a GEO positioning satellite tracker?

16 A.   That is correct.

17 Q.   So it's working on GPS?

18 A.   That's correct.

19      MR. GALYON:  Your Honor, I'm going to ask that the

20 track record itself -- it will start here with record one and go

21 through to the conclusion.  I'm going to ask that that be

22 admitted in as Government's 1.

23      MR. WHITE:  No objection.

24      THE COURT:  Government's 1 is admitted.

25 BY MR. GALYON:

1    Q.    In addition to the time and date, as we mentioned before,

2    is there also a record for speed of the target vehicle?

3    A.    Yes, there is.  Just that would be the fourth one down from

4    the top right corner there, where date and time record and then

5    speed.

6    Q.    So the track will go as part of essentially the computer

7    program; is that right?

8    A.    That is correct.

9    Q.    And generally, where is -- if you could provide sort of an

10   oral as to what we're seeing here.

11   A.    This is the area of High Point Road and Imanuel, and right

12   there is where High Point Road intersects with Imanuel Road.

13   He's going to be taking a right-hand turn toward Florida Street,

14   which is where the initial stop was attempted.

15         At that point at Florida Street, he did not stop, and

16   then the chase ensued on Florida Street, at which time the

17   speeds, as you can see, are reaching up to 80, 85 miles an hour

18   on Florida Street.  Just turned onto Holden Road.  Again, the

19   speeds are going to reach up in excess of 90 miles an hour, 93,

20   81, 92, so forth.  This is straight northbound on Holden Road.

21         At that point, he had turned onto Market Street,

22   again, at high speeds, 70 miles an hour on Market at one point,

23   and then he had turned into the Starmont Forest area, a

24   residential area.

25         At this point, I believe the patrol unit had been

1    chasing him, lost sight of him.

2            As you can tell, the speeds have reduced again and

3    pick back up once the patrol units come back into play.

4            Again, he's driving around the Starmont residential

5    area there, and I think that's Burlington Industries up on top

6    of the corner there.

7            I believe shortly after this is when the patrol units

8    will come back into play and the speeds will pick up once again.

9    He just made a U-turn.  I believe there was an intersection

10   where he made a U-turn.  He's back up to 80 plus in a

11   residential area, and at one point in the residential it was 98.

12   I think that was top speed going through Starmont Forest

13   subdivision.

14           At that point, he had made that hard turn and that is

15   where the accident occurred.

16   Q.   All right.  And then can you see on this particular map the

17   location of 506 Wedgedale Avenue?

18   A.   Yes.

19   Q.   Where is that?

20   A.   I believe that's the -- it's from that intersection with

21   Wedgedale Place, I believe that's the second house.

22   Q.   I'm going to have you step town, if you would.  Looking at

23   that view --

24           THE COURT:  What are the other roads visible there,

25   Mr. Williams?  What's the one going north and south to the left

Direct Examination - Det. Alex Williams

1   of that area?

2           THE WITNESS:  That's Wedgedale Avenue, and this is

3   Wedgedale Place.  506 -- I'm sorry, it should be this house

4   here.

5   BY MR. GALYON:

6   Q.   So from the intersection with Wedgedale Place onto

7   Wedgedale Avenue, it's how many houses up from that

8   intersection?

9           THE COURT:  Help me out with where Wedgedale is.

10          THE WITNESS:  Wedgedale Place is where the accident

11  occurred.

12          THE COURT:  Where is that located with regards to

13  Hobbs Road?

14          THE WITNESS:  This is Hobbs Road here.

15  BY MR. GALYON:

16  Q.   And Wedgedale Avenue, if you would point that out.

17  A.   That's here.

18  Q.   That's north/south --

19  A.   Correct.

20  Q.   -- on the diagram?

21  A.   And the accident would have occurred in this area, and then

22  I was advised by the officers who were in pursuit on foot that

23  he was apprehended, it would have been in this area here.

24  Q.   And 506 Wedgedale, if you could point that out.

25  A.   Yes.

1  Q.   And that's Wedgedale Avenue?

2  A.   Yes.

3          MR. GALYON:  Your Honor, I tender.

4          THE COURT:  Mr. White.

5                    CROSS-EXAMINATION

6  BY MR. WHITE:

7  Q.   Detective Williams, subsequent to Mr. Quesada Guerrero's

8  arrest, he was interviewed on a number of occasions, was he not?

9  A.   Yes, he was.

10  Q.   I believe the first such extensive debriefing occurred on

11  or about May 24th.  Does that sound about right?

12  A.   Somewhere in that neighborhood.  I thought it was the 25th,

13  but somewhere in that area.

14  Q.   24th and 25th, somewhere in that vicinity, according to an

15  agreement?

16  A.   Yes.

17  Q.   During the course of this investigation, there was a lot of

18  information that would it be fair to say, you gathered from

19  Mr. Quesada-Guerrero, other sources, your surveillance source,

20  kind of putting together to create the big picture of what was

21  going on overall?

22  A.   Right.

23  Q.   A lot of it was surveillance, but a lot of it was pieces

24  filled in by Mr. Quesada-Guerrero over time?

25  A.   Some pieces were.

1    Q.    He also accompanied you and other officers in identifying

2    some other locations later on, did he not?

3    A.    That's correct.

4    Q.    Some of those discussions within that first debriefing on

5    the 25th, entailed the storage of the controlled substances and

6    the trailer and the woods behind the trailer and activities that

7    occurred in that vicinity; is that correct?

8    A.    I remember he talked about the trailer, yeah.

9    Q.    And in fact, during those conversations, there also was

10   discussion that -- well, in fact, there was some debate about

11   whether or not there was any money located in the trailer, in

12   the tractor trailer that was stopped; is that correct?

13   A.    Right.  He had said that there was indeed currency in the

14   tractor trailer, but we hadn't found it.

15   Q.    I believe at a later time it was located, was it not?

16   A.    The currency?

17   Q.    Yes.

18   A.    No.  Not in the tractor trailer, no.

19   Q.    Where was the currency located?

20   A.    The currency from the tractor trailer?

21   Q.    Wasn't it subsequently located in Atlanta, Georgia?

22   A.    No.  It was believed that that was a possibility where the

23   currency might have gone, because the initial stop, it wasn't

24   located after his arrest, he said that it was in there, and we

25   had had it stopped again at a later time to try to find it, but

1    it had already spent a day in Atlanta, Georgia, and we believe

2    that it may have been dropped there, but we never found the

3    currency.

4    Q.    Is it fair to say we went sort of around and around with

5    that issue during the debriefing sessions; is that correct?

6    A.    Yes.

7    Q.    And the individual Mr. Loviana, he was never apprehended,

8    was he?

9    A.    That's correct.

10   Q.    But he was present on the day of Mr. Quesada-Guerrero's

11   apprehension?

12   A.    Yes.

13   Q.    And Mr. Sosa Dominguez was apprehended at the same time?

14   A.    That's correct.

15   Q.    Was there anybody else in the vehicle at that time?

16   A.    No.

17   Q.    When Mr. Loviana was observed arriving at the -- I believe

18   it was Dexter address, was he carrying anything that you are

19   aware of?

20   A.    Not that I'm aware of.

21   Q.    You were not the one who conducted that surveillance?

22   A.    No.

23         MR. WHITE:   I have no further questions.

24         THE COURT:   Mr. Galyon.

25         MR. GALYON:   Just briefly on redirect.

1                    REDIRECT EXAMINATION

2   BY MR. GALYON:

3   Q.   Mr. White was asking about the apprehension of individuals

4   on April the 11th.  When was Amado Sosa Dominguez, was he

5   arrested on that occasion?

6   A.   Yes, he was.

7   Q.   Did he have any firearms on him?

8   A.   No, he did not.

9   Q.   As far as a description of Mr. Guerrero, about how tall is

10  he?

11  A.   I would say he's about 5-foot four.

12  Q.   And what color hair?

13  A.   Black.

14  Q.   Do you know how old he is?

15  A.   Early 30's.

16  Q.   On April the 11th, do you recall what color shirt he had

17  on?

18  A.   A white T-shirt.

19            MR. GALYON:  I don't have anything else.

20            MR. WHITE:  Very briefly.

21                    RECROSS EXAMINATION

22  BY MR. WHITE:

23  Q.   Where was Mr. Sosa-Dominguez apprehended?

24  A.   In the same area.  Not in the same immediate area as

25  Mr. Guerrero, but in the same neighborhood, not far from that

1   location.

2   Q.   Had he fled the immediate scene of the accident or was he

3   very close to where the vehicle was?

4   A.   He had also fled -- I could testify what was told to me by

5   other officers.  He was apprehended in the same neighborhood.

6              MR. WHITE:  Nothing further, Judge.

7              THE COURT:  Anything further?

8              MR. GALYON:  Nothing else.

9              THE COURT:  Thank you, sir.

10             MR. GALYON:  United States calls Jeanne Thilo.

11             THE COURT:  How long do you anticipate the next

12  witness's testimony will be?

13             MR. GALYON:  Five minutes.

14             THE COURT:  We'll take our midmorning recess after

15  that then.

16             (JEANNE THILO, GOVERNMENT WITNESS, WAS SWORN.)

17                       DIRECT EXAMINATION

18  BY MR. GALYON:

19  Q.   If you would state your name.

20  A.   Jeanne Thilo.

21  Q.   Where do you live?

22  A.   506 Wedgedale Avenue in Greensboro.

23  Q.   And, do you work, Ma'am?

24  A.   Yes.

25  Q.   What do you do?

1   A.   I'm in finance.

2   Q.   Were you living back at 506 Wedgedale Avenue on April the

3   11th of last year?

4   A.   Yes, I was.

5   Q.   If you would, explain to the Court what happened involving

6   someone with a gun on that occasion.

7   A.   On that morning I was taking my two children and three of

8   my daughters' friends to the beach.  We were packing the car.  I

9   have a van.  We had put a turtle on top of it, and I knew that I

10  needed to put something underneath the turtle so it wouldn't

11  sing all the way down the highway.

12  Q.   When you say "a turtle," you are talking about one of those

13  storage containers that goes on top of the van?

14  A.   Right.  And it was on top of the luggage rack.  So I drove

15  into my driveway and my daughter went inside the house and I

16  opened the back hatch of my van and got some beach towels out.

17        I was up on the side board of my van.  I was putting

18  the beach towels in between the luggage rack and the turtle, and

19  all of a sudden, across the front of my yard I noticed someone

20  running quickly across my yard and through my driveway and all

21  of a sudden I felt something on the side of me, so I turned

22  around and saw a person standing next to the van and he had a

23  gun, and said something to me, but I don't know what was said.

24  It was either, get out of the car or, give me the car.  At that

25  point, because there was still three children in the car in the

1    very back, I said "No," and pushed that person away.

2    Q.   Was it a man or a woman?

3    A.   It was a man.

4    Q.   Do you know if he was white or black?

5    A.   He was white.

6    Q.   Do you recall what, if anything, he had on in terms of

7    clothing?

8    A.   All I can remember is a white T-shirt.

9    Q.   As far as hair color, do you recall if it was light or

10   dark?

11   A.   Dark.

12   Q.   And do you have any idea as to how old that person was?

13   A.   Young; 20, 30.

14   Q.   Was that person tall or short?

15   A.   Seemed shorter to me than me, because I was standing over

16   him.  He didn't seem like a very big person.

17   Q.   How tall are you?

18   A.   5-8.

19   Q.   I'm going to show you what's been introduced as

20   Government's 1.  Have you seen this before?

21   A.   Yes.

22   Q.   What is it?

23   A.   It looks like an aerial view of my neighborhood.

24   Q.   Do you recognize where your residence of 506 Wedgedale

25   Avenue is?

DIRECT EXAMINATION - JEANNE THILO

1  A.   I think it's that one.

2  Q.   And how is it that you believe or you can tell?

3  A.   Because I can tell -- I have a tree here and it's like a

4  cut out garden and that's my driveway and I'm assuming that's

5  Church Street.

6  Q.   From the corner of Wedgedale Place up Wedgedale Avenue,

7  about how many houses up is your house?

8  A.   Three.

9  Q.   The third house?

10  A.   Yeah.

11  Q.   And if you would describe for the Court the direction that

12  you say this person was coming from when they ran across your

13  yard.

14  A.   I was parked here in my driveway, and he ran across like

15  that and around my car, the front of my car.

16  Q.   And then after you pushed that person away, did you see in

17  which direction he ran?

18  A.   He ran back this way in between these two houses.

19  Q.   All right.  Did you subsequently, after you pushed that

20  individual, see other officers show up and give chase on foot?

21  A.   I did.  It seemed like the ones I saw came from the

22  Wedgedale Avenue street.

23         MR. GALYON:  I don't have anything else, Your Honor.

24         THE COURT:  Mr. White.

25         MR. WHITE:  No questions, Your Honor.

1           THE COURT:  Thank you, Ms. Thilo.  May she be excused?

2           MR. WHITE:  As far as we're concerned, Your Honor,

3   yes, sir.

4           THE COURT:  Why don't we take our regular midmorning

5   recess at this time.

6           (Recess taken from 11:10 a.m. to 11:30 a.m.)

7           MR. MCKNUTT:  I would like to call Corporal Gill.

8           THE COURT:  Come up and be sworn, if you will,

9   Corporal.

10          (CORPORAL H.W. GILL, GOVERNMENT WITNESS, WAS SWORN.)

11                       DIRECT EXAMINATION

12  BY MR. MCKNUTT:

13  Q.   Would you please state your name for the Court.

14  A.   Corporal H.W. Gill.

15  Q.   What's your employment?

16  A.   With the City of Greensboro Police Department.

17  Q.   How long have you been there?

18  A.   Seventeen years.

19  Q.   And what division do you so work?

20  A.   Central division.

21  Q.   And how did you come into contact with the Defendant?

22  A.   I was on routine patrol that day, and radio transmission

23  had alerted me that there was a vehicle pursuit near the

24  Friendly Shopping Center area.  I drove to that area, and I was

25  on Friendly Avenue and the intersection of Hobbs Road, noticed

1 out of the corner of my right eye, a large truck on Hobbs Road

2 entering the intersection, and it almost collided with my patrol

3 vehicle. That vehicle matched the description of the vehicle

4 that was being pursued. I then took out -- took chase toward

5 the direction it went on Hobbs Road, then found the vehicle

6 after he had crashed into a tree in front Wedgedale Place.

7 Q. Could you describe the vehicle?

8 A. It was a gray Nissan Titan.

9 Q. How were you able to locate the scene of the crash?

10 A. As I traveled south on Hobbs Road, I approached Wedgedale

11 Place, I noticed on the corner there appeared some turf had been

12 disturbed, as if the vehicle may have driven up on it. I then

13 turned onto Wedgedale Place and observed the truck to the right

14 after he crashed into the tree.

15 Q. After you found the truck, what happened next?

16 A. I exited my patrolled car. I didn't see any occupants in

17 the truck. The doors were opened. I then walked to the left of

18 the residence in which the truck had crashed into the tree, and

19 observed the suspect in the backyard of that residence.

20 Q. Can you see the map from there or would it be helpful to

21 come down?

22 A. I can come down.

23 Q. Could you point out exactly where you were when this

24 happened?

25 A. Let's see. This is the residence, I believe, that the

1   crash occurred in.

2           THE COURT:  Before you go further, where is Friendly

3   Avenue?

4           THE WITNESS:  It's up here, sir.

5           Traveled down Hobbs Road, and this is where I first

6   observed the disturbance in the grass, and then I'm not certain

7   if this house or this house that the truck crashed into.  Then

8   observed him in the backyard and I was here and he was here when

9   I observed him.

10  BY MR. MCKNUTT:

11  Q.   And when you saw him, what happened?

12  A.   He looked at me.  I was in full uniform.  I said, Stop.  He

13  took off running.  I then gave chase.  I rounded this corner of

14  this house here, and as I got down to here, I observed a minivan

15  in the driveway here and there was several occupants or people

16  standing around the van.  As I got closer, I noticed he was on

17  the driver's side of the van.

18  Q.   And what was he wearing at that point?

19  A.   A white T-shirt and blue jeans.

20  Q.   And what happened next?

21  A.   When I observed that, then I observed that he was in an

22  altercation with a female on the driver's side.  They were

23  standing outside the doorway of the vehicle.  I yelled to him

24  numerous times to stop, stop, back away, get on the ground.  He

25  then backed up from her, took off running in this direction here

1   toward the next door neighbor's house.

2   Q.   And did you follow him?

3   A.   Yes.  I then began pursuing him.  I got to about this

4   corner of the house where the van was, and he was down here next

5   to the fence to the backyard to that house, at which time he

6   turned, raised his handgun in my direction at me.  I immediately

7   took stance down on the ground, and then he lowered his gun and

8   took off running through the backyard.

9   Q.   At that point --

10  A.   At that point, I ceased chasing him any more, waited on

11  some assist units to arrive, and then we were alerted that he

12  was under a boat at a residence, I believe it might be this

13  residence right here, which is directly behind the house that he

14  was running from.  Went to that location and found him hiding

15  under a boat.

16  Q.   And when you got to the initial house with the woman and

17  the minivan --

18          THE COURT:  Keep your voice up now, please.

19  BY MR. MCKNUTT:

20  Q.   When you got to the initial house with the woman in the

21  minivan, was there anyone else around at that time?

22  A.   Yes.  There was several children around the van, and I

23  believe inside the van also.

24  Q.   And were there any other people?

25  A.   After he took off running, and I was looking in this

1  direction, I observed another Hispanic male standing here in the

2  same driveway where he had gone to, just standing there.

3  Q.  And did you ever see that man again?

4  A.  Yes, I did.

5  Q.  When was that?

6  A.  I saw him after the Defendant had been taken into custody.

7  I saw that gentleman again being brought to the police

8  substation for interview.

9          THE COURT:  What was that person wearing?

10          THE WITNESS:  I don't recall, sir.

11          THE COURT:  Do you know whether or not he was wearing

12  a white T-shirt?

13          THE WITNESS:  He was not wearing a white T-shirt.  I

14  do believe it was some sort of dark-colored clothing.

15  BY MR. MCKNUTT:

16  Q.  The man who pointed the gun at you, do you recognize him in

17  the courtroom today?

18  A.  Yes, I do.

19  Q.  Could you point him out?

20  A.  The gentleman right there in the orange jumpsuit.

21          MR. MCKNUTT:  Thank you, no further questions.

22          THE COURT:  You may return to the stand, unless

23  Mr. White, do you have questions that would entail --

24          MR. WHITE:  Very briefly, Your Honor.

25                          CROSS-EXAMINATION

1    BY MR. WHITE:

2    Q.    Were you present when Mr. Quesada was actually placed under

3    arrest?

4    A.    Yes.

5    Q.    Were there weapons located in the vicinity?

6    A.    Yes, sir.

7    Q.    And there was -- would you describe that for the Judge.

8    A.    Yes, sir.  There was a handgun lying on the pavement under

9    the boat that he was lying under, and there was also a handgun

10   located in his pants pocket.

11   Q.    And upon his apprehension, he offered no resistance; is

12   that correct?

13   A.    Correct.

14          MR. WHITE:  Nothing further.

15                       REDIRECT EXAMINATION

16   BY MR. MCKNUTT:

17   Q.    What day was this again?

18   A.    What day?  It was April 11th, I believe.

19   Q.    And do you remember what color the guns were?

20   A.    The one that I had any visual observation of was dark, dark

21   handgun.  I don't remember what the one was that they located in

22   his pants pocket.

23          MR. MCKNUTT:  Nothing further.

24

25                       RECROSS EXAMINATION

 1    BY MR. WHITE:

 2    Q.   There were no shots fired from any side during this; is

 3    that correct?

 4    A.   No, sir.

 5    Q.   Were the guns loaded when they were recovered?

 6    A.   I believe they were.  I did not deal with the handling of

 7    them.

 8              MR. WHITE:  Thank you.  Nothing further.

 9              THE COURT:  Thank you, sir.

10              MR. GALYON:  Your Honor, that's going to be the

11    Government's evidence.

12              THE COURT:  Will there be evidence, Mr. White?

13              MR. WHITE:  May I confer with the Defendant for a

14    moment, Judge, on that issue?

15              THE COURT:  Of course.

16              (Mr. White and the Defendant confer off the record.)

17              MR. WHITE:  Call Mr. Quesada, Your Honor.

18              (DANILO QUESADA-GUERRERO, THE DEFENDANT HEREIN,

19    SWORN.)

20                         DIRECT EXAMINATION

21    BY MR. WHITE:

22    Q.   Would you state your name for the Judge, please.

23    A.   My name is Danilo Quesada-Guerrero.

24    Q.   You heard the events of April 11th described here today.

25    Is there any question that you were the person who was being

1    described in those activities?

2    A.    No.

3    Q.    Now, when you left the truck after the accident, would you

4    tell the Judge exactly what happened.

5    A.    Tell him that it's the same thing as the policeman said,

6    but I never tried to attack the woman, nor did I point my gun at

7    the policeman.

8    Q.    Do you recall what you said to the woman, if anything?

9    A.    I just tried to hide behind the van, and I said, The police

10   is coming.

11   Q.    And what, if anything, did you have in your hand at that

12   point?

13   A.    Yes, I had a firearm.

14   Q.    Did you ever point it at her?

15   A.    No.

16   Q.    Did you ever try to get in the van?

17   A.    No.

18   Q.    What did you do after you had your encounter with her?

19   A.    She couldn't see me very well.  I just hid under -- or

20   behind the van.  He saw me.  She screamed and then I ran.

21   Q.    When you later saw the police officer, would you describe

22   for the Judge what happened.

23   A.    He just told me Stop, and I ran.  I didn't stop.

24   Q.    Was there a time when you ever stopped and turned back to

25   face him?

1    A.    No.  Never.

2    Q.    And how much time passed between the time you saw the woman

3    in the van and they found you under the boat?

4    A.    It was very fast.  I don't know.  I can't really calculate.

5    It was maybe three, five minutes.  It was really fast.

6    Q.    Turning your attention to your conversations with the

7    detectives after you were arrested, do you remember that

8    conversation?

9    A.    Yes.

10   Q.    And would you tell the Judge what you recall of that

11   conversation.

12   A.    The only thing I know is that he says I mentioned a hundred

13   kilos.  He recorded that whole conversation and I never

14   mentioned a hundred kilos.  He has that recording.

15   Q.    Now, the original conversation you had with him, is that

16   the conversation you are referring to?

17   A.    He recorded it.

18   Q.    Okay.  Do you remember, was that the same day that you were

19   arrested?

20   A.    No.

21   Q.    Do you remember him recording any conversation the same day

22   you were arrested?

23   A.    No.

24   Q.    Do you remember discussing Francisco with Detective

25   Williams?

1   A.   Yes.

2   Q.   And tell the Judge what you told Detective Williams about

3   Francisco.

4   A.   He asked me what he had to do with everything.

5   Q.   And what did you tell him?

6   A.   That he and Arlay were the ones who had something to do

7   with all of that business, that the things that they found in

8   the truck, they were not mine.  None of them were mine.  And,

9   that detective can tell you, because that was the investigation

10  he was doing.  If he was watching me as he says he was, he had

11  to know what Arlay put in the truck.

12  Q.   Let me again turn your attention back to the conversation

13  about the tractor trailer, not the truck you were driving.

14  What, if anything, did you tell Detective Williams about what

15  was in the truck?

16          THE COURT:  And you're talking about right after he

17  was arrested?

18          MR. WHITE:  Correct, Your Honor.

19          THE WITNESS:  That I told him was in the trailer?

20  BY MR. WHITE:

21  Q.   What was in the trailer?

22  A.   Nothing.

23  Q.   Do you remember ever having a conversation with him about

24  money in the tractor trailer?

25  A.   In the truck?

CROSS-EXAMINATION - CORPORAL GILL

1    Q.    No.  In the truck that Francisco was driving.

2    A.    No.

3    Q.    Changing subjects again briefly.  While you are on the

4    stand, would you tell the Judge who these folks are behind me

5    here.

6    A.    My family.

7    Q.    Would you identify them one by one for the Judge.

8    A.    My wife, my kids --

9          (Defendant left the witness stand.)

10          THE COURT:  Go back to the stand.

11          MR. WHITE:  We can leave that topic.  I can introduce

12    those folks to you at a later time.  I have nothing further,

13    Your Honor.

14          THE COURT:  Cross-examination?

15          MR. GALYON:  Thank you, Your Honor.

16                    CROSS-EXAMINATION

17    BY MR. GALYON:

18    Q.    Mr. Guerrero, on April the 11th of 2006, the date you were

19    arrested, you spoke with the police; is that right?

20    A.    Yes.

21    Q.    And did you tell them that there had been a hundred kilos

22    of cocaine brought to the trailer in the 18-wheeler that

23    Francisco had?

24    A.    No.

25    Q.    Did you tell Detective Williams that Francisco was the

1    driver of the tractor trailer?

2    A.    Yes.

3    Q.    Did you tell Detective Williams that you knew the tractor

4    trailer had been stopped because Francisco called you?

5    A.    Yes.

6    Q.    Did you tell Detective Williams that there was payment for

7    30 kilos of cocaine in the tractor trailer?

8    A.    No.

9    Q.    Did you tell Detective Williams that you knew the tractor

10   trailer had been searched that morning?

11   A.    Tell him that I told him that I only knew there was money

12   in that tractor trailer because of a sale that had gone by.

13   Q.    A sale of what?

14   A.    Cocaine, that I knew about.

15   Q.    I'm sorry.

16   A.    That I knew about.

17   Q.    So you did tell Detective Williams that you knew there was

18   money in the tractor trailer from the sale of cocaine?

19   A.    Yes.  Because Arlay had told me so.

20   Q.    And Arlay is Arlay Loviana?

21   A.    Yes.

22   Q.    He was one of the people that was in your truck on the day

23   you fled from the police; is that right?

24   A.    Exactly.

25   Q.    And who else was in the truck on April the 11th of 2006?

1   A.   Me, Arlay, Amado Sosa.  But really, Amado Sosa didn't know

2   what was there.

3   Q.   Didn't know what was there?

4   A.   The thing that Arlay had brought, because Arlay was going

5   to drop us off at the restaurant, and he was going to continue.

6   Q.   The thing that Arlay had brought was what?

7   A.   He didn't say specifically to me what he had brought, but I

8   know it was a bad thing.  He only asked me to borrow my truck,

9   and then I said, drop me off at the restaurant, and that's where

10  everything happened.

11  Q.   But you were driving before you got to the restaurant; is

12  that right?

13  A.   Yes.

14  Q.   And then when the police tried to stop you, you fled; is

15  that right?

16  A.   Exactly.

17  Q.   And you had two firearms on you; is that right?

18  A.   I had one, but the other one was under the seat and it was

19  Arlay's and I grabbed it.

20  Q.   And which one was that?

21  A.   The 38, the smaller one.

22  Q.   And what did you -- what was his gun?  What caliber was the

23  gun that he had that was not Arlay's?

24  A.   It was small.  I think it was a 25.  I don't remember.

25  Q.   And you deny that you pointed either of those guns at

1  either the woman at the minivan or at the police officer that

2  was following you; is that right?

3  A.   I didn't do it to either one of them.

4  Q.   You had rented hotel rooms for Francisco Ayala while he was

5  staying here.

6  A.   He rented them himself, I didn't.

7  Q.   Who paid for the trailer at Old Liberty Place?

8  A.   Amado Sosa.

9  Q.   And did Amado Sosa work for you at a nightclub that you

10  owned?

11  A.   Yes.

12  Q.   And he also worked for you in the drug business; is that

13  right?

14  A.   No.

15        MR. GALYON:  I don't have anything else.

16        THE COURT:  Mr. White.

17                     REDIRECT EXAMINATION

18  BY MR. WHITE:

19  Q.   Just very briefly.  Mr. Quesada, you speak some English, do

20  you not?

21  A.   I understand, but I can't speak --

22  Q.   When you said something to the woman near the minivan about

23  the police coming, did you say that in Spanish or English?

24  A.   In English.

25        MR. WHITE:  Nothing further, Your Honor.

1        THE COURT:  Mr. Quesada, are you saying you were not

2   involved in a conspiracy to distribute cocaine?

3        THE WITNESS:  No.  That cocaine had nothing to do with

4   me.

5        MR. WHITE:  Nothing further.

6        THE COURT:  Thank you, sir.

7        Anything further, Mr. White?

8        MR. WHITE:  I would like to briefly recall Detective

9   Williams, if I may.

10       THE COURT:  Surely.  You know, I think we are having

11  to confront issues at this point about acceptance of

12  responsibility and obstruction of justice.

13       MR. WHITE:  That's why I'm recalling Detective

14  Williams, Your Honor.

15       (DETECTIVE ALEX WILLIAMS, HAVING BEEN PREVIOUSLY

16  SWORN, WAS CALLED BY THE DEFENSE TO TESTIFY.)

17                      DIRECT EXAMINATION

18  BY MR. WHITE:

19  Q.   Detective Williams, you've had a number of conversations

20  with both myself and Mr. Quesada, have you not?

21  A.   That's correct.

22  Q.   And during the course of those conversations, pursuant to

23  an immunity agreement, Mr. Quesada indicated to you in some

24  detail about his involvement in a large-scale cocaine

25  conspiracy, did he not?

1    A.    That's correct.

2    Q.    And, in fact, on occasions, he even road with you to

3    identify locations that might have been possible either storage

4    facilities or places where transactions might occur?

5    A.    That's correct.

6    Q.    And in fact, subsequently one of those places resulted in a

7    fairly significant arrest, did it not, in terms of quantity?

8    A.    I don't recall that.

9    Q.    But he was cooperative to that extent at least with you?

10   A.    Right.  He road with us, but there was no seizures made.

11   Q.    Not during that time, but two or three months later at one

12   of the locations, was there not a significant arrest?

13   A.    Not that I'm aware of.

14   Q.    Did there come a time where a dispute more or less arose

15   between you on behalf of the Government and Mr. Quesada about

16   the role of Mr. Sosa?

17   A.    Yes.

18   Q.    And basically is that sort of what caused negotiations, for

19   lack of a better term, to breakdown?

20   A.    I expect so.

21   Q.    But he was forthcoming with you about his involvement in

22   this conspiracy, was he not?

23   A.    Correct.

24          MR. WHITE:  I have nothing further, Your Honor.

25          THE COURT:  Mr. Galyon.

1                    CROSS-EXAMINATION

2    BY MR. GALYON:

3    Q.   Just so we're clear, Mr. Quesada-Guerrero pointed out

4    residences to you during the period that he was under the

5    immunity agreement; is that right?

6    A.   Correct.

7    Q.   And did he provide specific information about dealing with

8    any of those individuals at the residence he pointed out?

9    A.   Most of those residences there was nothing concrete.  I

10   remember one residence in particular was that he said he had met

11   some folks to do a transaction at a particular house.  Most of

12   the other houses were along the lines of, I've heard that the

13   people that live here are involved in narcotics.  Those kinds of

14   things.

15   Q.   And nothing, to your knowledge, that Mr. Quesada-Guerrero

16   gave you was used in any subsequent prosecutions or

17   investigations; is that correct?

18   A.   Correct.

19   Q.   As to the specifics of Mr. Sosa Dominguez, the codefendant,

20   was there a period after this Defendant had an immunity

21   agreement, where he gave you a statement about Mr. Sosa

22   Dominguez's involvement?

23   A.   Yes, he did.

24   Q.   And prior to the trial of Mr. Sosa Dominguez, did you and

25   I, Mr. White and Mr. Quesada-Guerrero conduct a pretrial

1    investigation interview?

2    A.    Yes, we did.

3    Q.    Was the information that Mr. Quesada-Guerrero gave on that

4    occasion significantly different than the information that he

5    had previously provided to you?

6    A.    Yes, it was.

7    Q.    And in what sense was it significantly different?

8    A.    Whereas previously he had described the role in the

9    narcotics business of Mr. Sosa, in the pretrial interview, he

10   retracted and basically said that Sosa had nothing to do with

11   it.

12            MR. GALYON:  That's all I have, Your Honor.

13            THE COURT:  Mr. White.

14                     REDIRECT EXAMINATION

15   BY MR. WHITE:

16   Q.    In the interviews that you conducted with Mr. Quesada about

17   Mr. Sosa Dominguez's role, were you -- those were more

18   historical type interviews, for lack of a better term, would you

19   say?

20   A.    Yes.

21   Q.    In terms of who did what and who knew what, who probably

22   knew what, who did things?

23   A.    Correct.

24   Q.    Yet, when it came time for trial preparation, when you were

25   talking about asking him to put his hand on the bible to swear

1   to what he actually knew firsthand; is that correct?

2   A.    I guess you could say that.

3              MR. WHITE:  Nothing further.

4              THE COURT:  Thank you, sir.

5              Will there be further evidence, Mr. White?

6              MR. WHITE:  No, Your Honor.

7              THE COURT:  Mr. Galyon, Mr. McKnutt, will there be

8   further evidence for the Government?

9              MR. GALYON:  No, Your Honor.

10             THE COURT:  I'll be glad to hear from you all.

11             Mr. Galyon, will you be the one to --

12             MR. GALYON:  Your Honor, I will address all of the

13  issues, save the six level increase.  Since Mr. McKnutt handled

14  the direct on that, he's prepared to handle that portion, but as

15  to the other enhancements and issues related to the sentencing,

16  I'll handle those.

17             I don't know if you want him to deal with that first

18  and then I'll just sort of --

19             THE COURT:  Any way you want to approach it is fine.

20             MR. MCKNUTT:  Under the sentencing guidelines

21  3A1.2(c)(1) it says, "In flight of an arrest, if in a manner

22  creating substantial risk of serious bodily injury, the

23  Defendant knowing or having reasonable cause to believe that a

24  person was a law enforcement officer, assaulted such officer

25  during the course of the offense, the offense level is increased

1   by six levels."  And in the application note, note four, it adds

2   that, "substantial risk of serious bodily injury is to include

3   any more serious injury that was risked as well as actual

4   serious bodily injury, if that injury occurs."

5           Here, Corporal Gill testified that the Defendant

6   pointed a gun directly at him.  This is common law assault.

7   Although he did not fire the gun, he put Corporal Gill in risk

8   of serious injury, qualifying for the six level adjustment.

9           There has only been one case to specifically address

10  the issue of this, of pointing a gun, or reaching for a gun

11  under the sentencing guidelines, but not actually firing.  This

12  was in the First Circuit in 1999, it was United States versus

13  Lee that the court upheld the enhancement when a defendant

14  reached for the gun in his belt but did not actually grab the

15  gun, because he was being apprehended by officers.

16          THE COURT:  Anything further?

17          MR. MCKNUTT:  That's all, Your Honor.

18          MR. GALYON:  Your Honor, as to the other issues, let

19  me, even though there has been a concession as to at least the

20  chase portion, and I think perhaps the reckless endangerment

21  under 3C1.2, I just ask that the Court take into consideration

22  not only the flight, and you seen the video related to that and

23  heard the testimony about the speed and the fact that he almost

24  collided with Corporal Gill, but also the issue related to the

25  reckless endangerment pointing the gun or putting it into the

side of Ms. Thilo during the course of that flight as well,
there has, of course, been conflicting testimony about that I
would argue that the preponderance, based on the preponderance,
that the Government has met its burden as far as the information
that she provided. I think that, too, would be an alternative
basis for the Court to find reckless endangerment.

As to one of the other issues that the Court brought
up, and that is the issue of obstruction, I think that based on
the Defendant's testimony, that he would qualify for the
obstruction enhancement as well, given that, of course,
obstruction can apply to the administration of justice at any
stage, including a sentencing hearing, and I think the
Defendant's statements today were qualifying under 3C1.1, where
he's denying -- basically admits to putting himself there at the
location there on Wedgedale at that minivan, but simply says he
was hiding and then when the woman screamed, ran away, and that
when the officer told him to stop, he simply didn't stop.

I would argue that the more credible evidence from the
two witnesses that you heard from was, that he did in fact try,
at gunpoint, to get the vehicle from Ms. Thilo, and that also
when the officer continued to give chase, that he turned and
brandished the firearm, pointed it at the officer.

I would argue that his denials today are certainly at
odds with the credible evidence. Of course his denials today
about involvement in any conspiracy, essentially, whereas he's

1    previously given information that sort of -- that's directly at

2    odds with that.  I think that that's certainly an issue as well,

3    and I think that that goes to the heart of the 50 to 150-kilo

4    argument as far as the relevant conduct for the conspiracy.

5            He admits that he talked with the officers on the day

6    that he was arrested, that he gave them information about

7    knowing Francisco, and of course Francisco Ayala, who was the

8    truck driver for the 18 wheeler, admits to knowing the other

9    individuals that Detective Williams talked about, that Sosa was

10   the one that got the trailer, and specifically as to the

11   statements that he gave to Detective Williams, the fact that

12   there was a hundred kilos that had been brought in on that

13   tractor trailer, and then according to the statement that he

14   gave to Detective Williams, that that hundred kilos had been

15   stored at some point at the trailer there at Old Liberty Place

16   but was now gone, I think is consistent, too, with the later

17   information that there's this additional 7 kilos that, as the

18   Court is well aware, there is, when you got a stash-house, you

19   have the cocaine in a stash-house, but of course it's going to

20   be distributed out to individuals, and that doesn't change the

21   fact that some of the other conspirators may have some of that

22   cocaine later on.

23           We're talking about a short period of days here, and

24   the seven plus kilos that's then discovered in the Titan, I

25   would argue is, part of the same course of conduct, and I would

1    argue, too, that that goes to the credible information that this

2    Defendant gave at the time when he said that there was payment

3    for 30 kilos of cocaine in the tractor trailer.

4          The fact that not all the payment had been received

5    back is fairly common, that a large portion of the proceeds from

6    the previous cocaine sale were in that vehicle, of course they

7    weren't recovered by law enforcement but, you know, that,

8    unfortunately, happens as well, that there are occasions where

9    the cocaine is hidden so well, that it's simply not found, that

10    there's a false compartment or something of that sort, and, too,

11    one of the unobjective parts is highly indicative of this

12    Defendant's role in this conspiracy and the fact that he knew

13    precisely what was going on.  When he talked about the hundred

14    kilos, it wasn't just that he had heard about that, but rather

15    that he was directly involved, and that is, you'll note from the

16    presentence report, that there was information that once the

17    tractor trailer is stopped, that based on toll records,

18    Francisco Ayala's phone is in contact with this Defendant's

19    phone at about eight in the morning, and that within a few

20    moments of those calls, there is a call from this Defendant's

21    phone to Francisco Flores, who was at the trailer, and then the

22    subsequent surveillance at that trailer, just a few minutes

23    later, is Francisco Flores taking the assault rifle and

24    packaging materials from that trailer and hiding them in the

25    woods.  I would argue to you, if he didn't have anything to do

1    with anything that was going on at that trailer and the cocaine
2    business that was associated with that trailer, anything to do
3    with the tractor trailer and the cocaine that had been on that
4    tractor trailer and the proceeds that were in it, he never
5    receives those calls, he never makes those calls.  I think that
6    they are certainly indicative of what was going on.

7            And, his current denial about involvement in the
8    conspiracy or knowing that cocaine had been brought to that
9    location is, just a matter of convenience at this point for his
10   sake, and so based on the credible evidence that the Court has
11   heard and the unobjected evidence that's in the presentence
12   report about his involvement with the other coconspirators, I
13   would argue that the relevant conduct portion is the 50 to
14   150 kilograms that we've suggested, that probation has found,
15   and that we've argued for in our position paper.

16           Your Honor, I think that that would be the sum and
17   substance of our argument.  I don't think that there is anything
18   else.

19           THE COURT:  Thank you, Mr. Galyon.

20           Mr. White.

21           MR. WHITE:  Thank you, very much, Your Honor.  Judge,
22   I don't know quite where to start.  Start first with the
23   two-level enhancement with regard to the chase that we basically
24   agreed to.  With regard to what happened with the woman at the
25   minivan, Judge, Your Honor's recollection of the evidence is

1  perhaps better than my own.  I don't recall Ms. Thilo saying

2  anything about the gun being put in her side.

3          THE COURT:  I heard that testimony.  She did say that.

4          MR. WHITE:  I can miss some because I was trying to

5  listen back and forth.  I'll defer to Your Honor's recollection

6  on that.

7          With regard to what was said, and what is really

8  almost irrelevant because we are conceding the points associated

9  with this conduct, and there is no question that by bringing a

10 police chase into her backyard while she was getting ready to go

11 to the beach with her children put her in danger.  There is no

12 question about that, Judge, and that's why we conceded that

13 particular enhancement.

14         Mr. Quesada was emphatic, however, that he never

15 attempted to take the van, never attempted to assault the woman,

16 and once he realized that she was obviously in danger and upset,

17 certainly understandably to say the least by the situation, he

18 fled the vicinity and was later apprehended.

19         Similarly, Judge, the significant enhancement with

20 regard to the assault on a law enforcement officer, which is the

21 language of the statute and putting the officer in imminent

22 danger of harm, the officer's testimony was, he stopped at one

23 point and raised the gun, pointed it in his direction.  The

24 officer didn't stick around to see what was going to happen, he

25 dunked behind the building.  There is no doubt that was the

1 officer's perception. Mr. Quesada indicated he turned, he was
2 running, he was trying to get away, he ended up hiding under a
3 boat.

4        I would urge Your Honor to look at that kind of
5 conduct and compare it with the conduct with which he's accused.
6 Regrettably, Judge, I hate to say so bluntly, if he was going to
7 take the minivan, he would have taken it. He had a gun.

8        THE COURT: The complicating factor there was Corporal
9 Gill, who was watching, and what he might have done without
10 Corporal Gill being there yelling to him, may have been
11 different from what actually happened. But, now, Mr. White,
12 let's think about this for just a minute. Here is somebody who
13 says he was not really involved in cocaine, who is driving over
14 90 miles an hour in a rural area, in a residential area, who is
15 going over 80 on Hobbs, over 90 in that residential area. You
16 know, why is he trying to elude the officers, if he's not
17 involved in something; who takes, he says, somebody else's
18 firearm that was on the seat of that truck. Why would he take
19 someone else's firearm, unless he were taking it for a purpose?
20 Here is somebody who, in spite of Ms. Thilo's very credible
21 recounting of what took place, says I didn't do that. I
22 wouldn't have done that, yet he took the firearm from the truck.

23       In spite of Corporal Gill's very credible account of
24 what took place that caused him, to hit the ground and not go
25 after him. He says he didn't do that, either, and in spite of

1    Detective Williams' recounting credibly statements that were

2    made after the arrest, he says I didn't make those statements.

3            So, when you take all of that into account, doesn't

4    that paint a little different picture than what you are saying?

5            MR. WHITE:  Absolutely, Judge.  With regard to his

6    involvement, I addressed that.  Perhaps I addressed the issues

7    in the wrong order.  His comment to the Court, in response to

8    the Court's question, I think specifically related to that

9    particular transaction that day.  It turns out it was

10   approximately 8 kilograms of cocaine in the napsack that I

11   believe the evidence would show that the other individual put in

12   the truck.  I think Mr. Quesada's -- and you can see from the

13   testimony, I'm not trying to testify myself -- perception of

14   what a conspiracy is, is different than the Court's perception

15   and what a conspiracy in fact is.

16           Judge, he indicated he does say he knew whatever it

17   was was bad.  He recounted in great detail over a period of

18   interviews with Detective Williams his involvement in a

19   large-scale cocaine conspiracy in the past historically,

20   pursuant to an immunity agreement which broke down for reasons

21   Mr. Galyon quite accurately put forward, and I'll get into that

22   in a minute, if I may.

23           His sense of ownership, that was Arlay's cocaine and

24   had nothing to do with me.  He knew it was bad.  He knew it was

25   dangerous.  He knew it was part of a conspiracy.  He knew he was

1   in trouble when he got pulled over.  He led a high speed chase

2   and, thankfully, no one got killed and that's close to my

3   neighborhood, as I know Your Honor is familiar with.  That

4   situation was a horrible situation, yet it wasn't as bad as it

5   could have been, thankfully, because he is not a kidnapper, not

6   an armed robber, somebody who is going to be shooting guns at

7   police officers.

8           THE COURT:  Why did he take that gun?  Why did he have

9   it in his hand?

10          MR. WHITE:  I wish I knew the answer.  He said it was

11  there, I grabbed it and ran.  That was his answer.

12          THE COURT:  If he's not a person who, as you say, who

13  would not do something like that, why did he have the gun?  Why

14  did he have one in his pocket?

15          MR. WHITE:  If he was a person like that, Judge, shots

16  would have been fired and somebody might have been dead.

17          THE COURT:  Well, if Corporal Gill might not have been

18  there, we don't know what would have happened with Ms. Thilo.

19          MR. WHITE:  We don't, Judge, and I wish we could, and

20  this has been a crux of problems since this case's inception,

21  even when it started in state court, where he was charged, of

22  course, with armed robbery and kidnapping, and those charges

23  went away when the Federal Government adopted the cocaine

24  conspiracy.

25          I don't know what else to tell you, Judge, except

1    perhaps to phase into the rest of my argument and point out how

2    completely out of character that kind of conduct is for

3    Mr. Quesada-Guerrero, based on the information in the

4    presentence report.

5            It was, I would submit, Judge, it was a panic

6    situation there, that there is no question that both Officer

7    Gill and Ms. Thilo perceived that he did exactly what they say

8    he did.  Whether he intended to do that and whether there was an

9    actual threat of serious bodily injury or harm is a question for

10   this Court.  I obviously see which way the Court is leaning on

11   that, and at this point I would kind of phase into the next

12   phase, if I may, and talk to you more about

13   Mr. Quesada-Guerrero.

14           THE COURT:  With regard to whether or not he has

15   testified falsely knowingly today in material matters by denying

16   what took place as Ms. Thilo testified, by denying that he

17   pointed the firearm at Corporal Gill, by denying that he made

18   statements with regard to money for 30 kilos having been in the

19   tractor trailer when it was stopped, do you wish additional time

20   to prepare for an argument with regard to whether or not that

21   constitutes obstruction, and if so, what should be done about

22   it?

23           I will give you additional time.  I will continue this

24   matter until Friday morning if you would like for you to do

25   that, or if you need more time than that, I'll give you more

```
 1   time than that.
 2            MR. WHITE:  I think that might be helpful, Your Honor,
 3   if I may take advantage of the Court's kindness, and we'll be
 4   ready by Friday, Judge.  If something should come up tomorrow
 5   that I don't anticipate, or this afternoon, I'll alert the Court
 6   immediately, but I don't see any problems with being back here
 7   Friday.
 8            THE COURT:  And I think perhaps it would be better to
 9   address all of that at the same time.
10            MR. WHITE:  Thank you, Your Honor.
11            THE COURT:  Mr. Galyon, is there anything that you
12   would like to address at this time before we adjourn?
13            MR. GALYON:  No, sir.
14            THE COURT:  Mr. McKnutt?
15            MR. MCKNUTT:  No, Your Honor.
16            THE COURT:  We'll adjourn then until 2:00 o'clock.
17            (Court adjourned at 12:20 p.m.)
18
19
20
21
22
23
24
25
```

1                      C E R T I F I C A T E

2

3          I, J. CALHOUN, RPR, United States District Court

4     Reporter for the Middle District of North Carolina, DO HEREBY

5     CERTIFY:

6

7          That the foregoing is a true and correct transcript of

8     the proceedings had in the within-entitled action; that I

9     reported the same to typewriting through the use of

10    Computer-Aided Transcription.

11

12         THIS TRANSCRIPT CERTIFICATION IS VOID, IF THE SIGNATURE

13    IS NOT ORIGINALLY SIGNED BY THE COURT REPORTER WHO REPORTED

14    THIS MATTER.

15

16

17    Date: 7/10/08              /s/ J. Calhoun
                                 J. Calhoun, RPR
18                               Official Court Reporter

19

20

21

22

23

24

25