1              IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2

3   UNITED STATES OF AMERICA,          Criminal Action
                                       No. 1:07CR43
4          Plaintiff,

5   vs.                                Greensboro, North Carolina
                                       November 9, 2007
6   DANILO QUESADA-GUERRERO,           9:35 a.m.
                                       Pages 57 - 80
7          Defendant.

8   _____/

9                          VOLUME II

10          TRANSCRIPT OF SENTENCING PROCEEDINGS

11       BEFORE THE HONORABLE N. CARLTON TILLEY, JR.

12                 UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Government:     RANDALL GALYON, ESQUIRE
                            Assistant United States Attorney
15                          Post Office Box 1858
                            Greensboro, North Carolina 27402
16

17  For the Defendant:      CHARLES WHITE, ESQUIRE
                            Post Office Box 9518
18                          Greensboro, North Carolina 27401

19
    Court Reporter:         J. Calhoun, RPR
20                          Room 101, U.S. Courthouse Building
                            324 West Market Street
21                          Greensboro, North Carolina 27401
                            (336) 332-6033
22

23
            Proceedings reported by stenotype reporter.
24      Transcript produced by computer-aided transcription.

25

```
 1          (Defendant is present.)

 2          THE COURT:  Mr. Galyon.

 3          MR. GALYON:  First matter for the Court this morning

 4   is 1:07CR43-1.  It's United States of America versus

 5   Quesada-Guerrero.  Your Honor, he's represented by Charles

 6   White.

 7          Ms. Bojanini is here for purposes of translation.  The

 8   matter is on for imposition of sentence.

 9          THE COURT:  Ms. Bojanini was sworn last time, so I

10   don't believe we need to redo that this time.  Thank you for

11   being here.

12          There was to be evidence, or we're just here to talk

13   about the obstruction?

14          MR. GALYON:  That's correct, Your Honor.

15          THE COURT:  No further evidence?

16          MR. WHITE:  No further evidence for the Defendant,

17   Your Honor.

18          THE COURT:  Mr. Galyon, why don't I hear from you with

19   regard to obstruction, and then I'll hear from Mr. White with

20   regard to that, and then with regard to whether or not if

21   obstruction is found, that would impact on the finding of

22   acceptance of responsibility.

23          MR. GALYON:  Your Honor, as to obstruction under

24   3(c)1.1, I would argue that there are -- would be bases in terms

25   of the commentary notes for 4B and F.  B refers to a covered
```

1    reason for providing for the obstruction enhancement based on

2    committing perjury that pertains to conduct that forms the basis

3    of the offensive conviction, and note F talks about the

4    obstruction enhancement is appropriate if the individual

5    provides materially falls information to a judge or magistrate;

6    and the Court, during our hearing on Wednesday, sort of

7    mentioned the three areas that really are the issue that I think

8    impact on obstruction:

9            One is the Defendant's denial about putting the gun in

10   Ms. Thilo's side, because that is the basis for an enhancement

11   that is certainly relevant conduct.  I think that that could be

12   one of the grounds.  Certainly there was credible testimony

13   regarding that.

14           In addition, the Defendant's denial, false denial

15   about pointing the gun at Officer Gill, and the fact that that,

16   too, is the basis for a six level enhancement, which is

17   certainly relevant conduct as well.

18           Lastly, his denial of statements to Detective Williams

19   subsequent to his arrest, but before the immunity agreement was

20   in place regarding the 100 kilos, he claimed that he never made

21   that statement.  He also initially denied during his testimony

22   that he made any statement about 30 kilos payment being included

23   in the tractor trailer that was stopped, and then during cross,

24   he did admit that he told the officer that there was money in

25   the truck, but that he didn't have anything to do with that,

1   despite his admission that he, of course, knew the driver of the

2   truck, that there had been phone contact between them

3   immediately after the stop of the tractor trailer by law

4   enforcement, the fact that the Defendant admits that he knew

5   that the officers had attempted to search but found nothing, so

6   all of those things certainly don't square in terms of his

7   statements, and I would argue that that, too, can be a basis for

8   obstruction, because he, this Defendant, by swearing an oath and

9   then testifying before the Court falsely, I think puts himself

10  at risk of the obstruction enhancement.

11          In addition to that, Your Honor, his claim even on the

12  stand that the codefendant Sosa-Dominguez was not involved,

13  didn't have anything to do with the conspiracy can also be a

14  basis.

15          Fourth Circuit case United States versus Keiland, 360

16  F. 3d. 456, a 2004 case out of this circuit indicating false

17  statement regarding culpability of a codefendant is also

18  sufficient to support an enhancement for obstruction, and I

19  would argue that, too, is sort at the heart of the issue

20  regarding this Defendant's denials about his involvement,

21  really, in the conspiracy, and the involvement of others in the

22  conspiracy as well.

23          So, I would argue that under those various grounds,

24  that the 3(c)1.1 obstruction enhancement would be appropriate.

25          If the Court wants me to, I only have a very short

1    comment related to the denial of acceptance.  If the Court wants

2    me to address that, I will.

3          THE COURT:  Remember, acceptance is the Defendant's

4    burden to prove.  I will let you, since you have the floor, go

5    ahead and make it.

6          MR. GALYON:  The only other part about that is the

7    false denial, of course, of relevant conduct, and denial of the

8    conspiracy would be a basis for denial of acceptance, and in

9    particular, that commentary note four in 3E1.1 talks about only

10   in the extraordinary case where an individual can, if the person

11   gets obstruction, can then get acceptance as well, and I would

12   argue that this is not an extraordinary case, that what we've

13   seen based on the Defendant's own testimony on Wednesday is,

14   clear evidence of the fact that he's not accepted responsibility

15   for his conduct.  He's continually tried to minimize and spin

16   his involvement and the involvement of others in the conspiracy.

17         THE COURT:  Thank you.

18         Mr. White.

19         MR. WHITE:  Thank you, very much, Your Honor.

20         Judge, with regard to the three aspects, I would agree

21   with Mr. Galyon that would appear to be -- well, perhaps let me

22   phrase it upon which there was conflicting evidence.

23         Judge, I would certainly agree with the Court's

24   analysis that the testimony of all of the witnesses was

25   extremely credible.  It was straightforward and there were no

1   contradictions.  There was no indication of deception or

2   anything of the sort and I would never suggest that there was.

3   What I would suggest, Your Honor, is in each instance there was

4   a question of perception.

5           Judge, with regard, first of all, to the statement to

6   Detective Williams regarding the hundred kilograms in the truck,

7   30 of which -- payment for 30 of which was in the truck that

8   left the scene.  Judge, as Detective Williams indicated during

9   cross-examination, we went around and around about that during

10  the debriefing sessions.  Danilo has consistently insisted that

11  was a misunderstanding, he didn't mean to say that, he didn't

12  say that, and that wasn't part of the thing, yet he went on in

13  great detail about other involvement that he had and was very

14  thorough in his involvement and the involvement of others

15  throughout the course of the conspiracy.

16          Jumping a little bit out of order, that brings us to

17  the situation involved in the codefendant Mr. Sosa.  First of

18  all, I don't believe there is any evidence before --

19          THE COURT:  I'm not going to base a finding on that.

20          MR. WHITE:  Thank you.  Then I won't belabor that

21  issue.

22          The next statement then, of course, is the testimony

23  of Ms. Thilo, who unquestionably, believed, and was -- she was

24  in danger, Judge.  When we did admit and withdraw any objection

25  to that enhancement, it was intended to cover all the conduct;

1    the chase and the incident with Ms. Thilo -- Danilo --

2    Mr. Quesada, rather, is insistent that he never intended to harm

3    that woman, never intended to take her van, and he -- I pressed

4    him on that.  I said, if there was anything involved there, if

5    it was a fleeting moment, idea, it was something you panicked

6    and then realized it wasn't a good idea, he said he never

7    intended to harm that woman, never intended to take her van.

8    He's been insistent on that consistently; yet, he has gone

9    through the entire process and been forthright about everything

10   else involved in the case, and I would submit, Your Honor, he

11   was forthright about that.  It was her perception.

12   Unquestionably she was in danger, and yet I believe that

13   Mr. Quesada-Guerrero never intended to harm that woman.

14          Similarly, Judge, he never intended to point the gun

15   at the police officer.  The police officer said he stopped

16   exactly what might have happened, I'm chasing somebody who is

17   waving a gun, I'm going to assume he's pointing it at me if it

18   comes back at me.  Mr. Quesada-Guerrero indicated that he did

19   not intend to shoot at the officer.

20          Candidly, Judge, if he had intended to shoot at the

21   officer, he would have shot at the officer.  Similarly, if he

22   intended to take the van, he would have taken the van.  That was

23   the basis for his testimony, he didn't intend to do either of

24   those things.

25          The last aspect, something I said concerning the

1   officer, Judge, and I completely lost it.  I beg the Court's

2   pardon.

3         Last aspect with regard to the testimony he gave on

4   the stand about not being involved in that particular

5   transaction.  Obviously, Judge, he was involved in the

6   transaction.  It's a semantic situation, I would suggest to the

7   Court that was Arlay's -- that was Arlay's deal.  He admitted he

8   was helping Arlay.  We know being trained in the law that's

9   being part of the conspiracy, that makes it just as much his as

10  Arlay's, and he drove recklessly, crazily, and we're lucky

11  nobody is dead, Judge, there is no question about that.  He knew

12  it was bad.  He didn't know how much it was, and that was the

13  basis of the testimony, Judge, it wasn't intent or to minimize

14  his involvement.  He spent hours, Judge, detailing his

15  involvement in this conspiracy, and we urge Your Honor to not

16  find obstruction as a result of that.

17        THE COURT:  Thank you, Mr. White.

18        I really did not get the impression from Detective

19  Williams' testimony, that Mr. Quesada was forthright in

20  detailing all of his activity in what took place.

21        In hearing the testimony of Ms. Thilo and Corporal

22  Gill, I simply can't square that, either with Mr. Quesada's

23  testimony or your explanation of a difference in perception.

24  There was a reason he was driving over 90 miles an hour in a

25  residential area.  He was trying to evade the police for a very

1   good reason; there was a large quantity of cocaine in his truck.

2   He was aware of it.  He says that was not his 38, but yet he

3   picked it up, he took it with him.  Why would you take a gun

4   with you, unless you had some intent to use it?

5             MR. WHITE:  That's what I forgot to address.  May I

6   address that briefly?

7             THE COURT:  You certainly may.

8             MR. WHITE:  Thank you, Judge.  Again, I asked him

9   about that in some detail as well.  I should say

10  parenthetically, I've had a chance to talk with him too much.  I

11  couldn't find him last night, yesterday afternoon.  The

12  authorities in Alamance said he wasn't there.

13            THE COURT:  I can't accept your proffer of something.

14  If there is further evidence, you may present it, and you may

15  certainly argue anything that is in evidence or fairly inferable

16  from that, but I can't accept your proffer of testimony that has

17  not been offered.

18            MR. WHITE:  I was getting ready to ask the Court's

19  permission to do that.  So with that, I will have to sit down.

20            THE COURT:  I will be glad for you to present further

21  evidence.

22            MR. WHITE:  I don't think that's necessary, Judge.

23  Again, the hypothetical theories I more or less set forth on

24  Wednesday, that he panicked, he grabbed it to get it out of the

25  vehicle, I would reiterate those without proffering.

1   THE COURT:  I have tried to think of a good reason

2  somebody would pick up the gun unless they felt there was some

3  reason to use it, or why Ms. Thilo would think she felt a gun in

4  her side when she didn't.  I don't think that was a matter of

5  perception.  I think Mr. Quesada did not commandeer the van

6  simply because Corporal Gill was yelling at him to get down on

7  the ground and throw the gun down.

8    I don't know whether he understood what Corporal Gill

9  was saying.  I did get the perception in watching him testify,

10  that he was understanding questions in English before they were

11  translated, and sometimes you can tell the way somebody

12  swallows, that they are reacting to a statement that's being

13  made or a question being asked, and I did get that perception.

14    Regardless of that, however, I cannot accept the

15  testimony as being truthful or simply a difference of perception

16  that he did not intentionally point the firearm at Corporal Gill

17  or attempt with the firearm to commandeer the van.

18    I do not need to reach the questions about Mr. Sosa.

19  I do not find him to be a credible witness.  I accept what

20  Detective Williams said with regard to the statements that he

21  made pertaining to money and amounts of cocaine following his

22  arrest.

23    I don't think we did address, Mr. White, and if you

24  would like to do that, I'll certainly be glad to hear from you,

25  why this would be one of those exceptional or extraordinary

1    cases where in the face of a finding of obstruction, he should

2    also receive credit for acceptance of responsibility.

3             MR. WHITE:  If Your Honor please, I would simply point

4    out that the nature of the proceeding, in other words, Judge,

5    the acceptance of responsibility, he accepted full

6    responsibility for the offense conduct with which he's charged;

7    the cocaine conspiracy, and the only difference being the

8    timing, if you will, of the statement and the fact that there is

9    a disagreement as to exactly what his initial statement was with

10   regard to the hundred kilograms and payment of 30 kilograms.

11            The other situation, the discrepancy with regard to

12   the alleged kidnapping, the attempting carjacking, if you will.

13   He accepted the points on that situation, Judge.  There was no

14   objection to the points that were assessed for that conduct,

15   along with the high speed chase conduct, so I would submit that

16   any misrepresentation there was not material, even though the

17   Court obviously has found that there is a discrepancy.

18            With regard to the pointing of the gun at the officer,

19   again, it is relevant to a sentencing determination question.

20   It's a huge enhancement, six level enhancement, and he simply

21   contends that it didn't happen and there is not much more I can

22   say about that.

23            Judge, he not only accepted responsibility for the

24   conduct for which he was apprehended, Judge, but he did continue

25   to cooperate.  There are allegations that he was not as

1    forthright as he could have been in the course of that

2    cooperation, yet he did give a great deal of information, and

3    rode with the detectives located the various locations and did

4    provide that kind of response --

5            THE COURT:  Well, the testimony I remember from

6    Detective Williams about that was, except for one place, which

7    was a cold place, that statements he made to the officers

8    were -- I heard something that cocaine was being sold here, and

9    that he never, except for possibly one place, said I know what

10   was happening there, I was involved in what was happening there,

11   so if that is the case, that does not seem to me to be a

12   terribly great effort to cooperate or give information.  Maybe

13   I'm misunderstanding.

14           Did I misunderstand that?

15           MR. WHITE:  I think with regard to that particular

16   testimony, I think that's certainly a fair way to interpret

17   Detective Williams' testimony.

18           THE COURT:  And then I heard him say that Mr. Sosa was

19   not involved, that he really was not involved in knowing whether

20   money was in the truck or not when it left, or how much cocaine

21   had been there, and I heard you say you had gone around and

22   around with that, so I infer that's the position he was taking

23   when you and he were talking to the officer.  So, I'm not sure I

24   see exactly what help he was.

25           MR. WHITE:  Judge, again, in terms of the assistance,

1  obviously the Government did not file the motion we had hoped

2  they would file in the sentencing, in connection with that, and

3  that's within their discretion. We didn't argue that. In terms

4  of accepting responsibility, I would say he did accept his

5  responsibility, and went above and beyond just saying, yes, I

6  did it. He did provide some additional information, by all

7  accounts. We think it was a lot more than the Government

8  interpreted it as. I think it's certainly sufficient to

9  establish acceptance of responsibility.

10            THE COURT: Well, what I heard was a denial of much of

11  what I thought was shown to be his responsibility, and hearing

12  that, it does seem to me, that this cannot be that acceptance,

13  or extraordinary case where both would apply, so I do find that

14  he should not receive credit for accepting responsibility.

15            I have no idea where that all comes out within the

16  guideline computation.

17            Mr. Miller.

18            THE PROBATION OFFICER: Your Honor, with the

19  additional two levels for obstruction, that would place him at

20  level 46, which under the guidelines would be 43, which is the

21  top of the offense levels. No acceptance of responsibility

22  would remain at level 46. Guideline range is life, Your Honor.

23            THE COURT: Do you agree with that, Mr. White? I'll

24  be glad to hear from you if you do.

25            MR. WHITE: Only to the extent I've argued until I

1  disagree with it, Your Honor.

2          THE COURT:  You disagree with the finding, but not

3  given the finding with the guideline?

4          MR. WHITE:  I believe the total offense level was 41,

5  Judge, as originally calculated adding the two levels takes it

6  to 43, adding three additional levels for subtracting or

7  negative, negative, does it take it to 46, Your Honor.

8          THE COURT:  And you agree with what Mr. Miller has

9  said, Mr. Galyon?

10         MR. GALYON:  Yes, sir.

11         THE COURT:  Mr. Galyon, is it your position, that

12  Mr. Quesada is deserving of no consideration for whatever

13  cooperation he may have given, which would equate to a sentence

14  of less than life?

15         MR. GALYON:  Your Honor, that is correct.  And, I

16  would take that position based on both the evidence that you

17  heard yesterday or on Wednesday with respect to this Defendant's

18  information and the fact that none of the information that he

19  gave about being at locations, save and except one of those

20  locations was information based on his personal knowledge, and

21  then beyond that, that the location that he gave information

22  about, the officers have not been able to do anything based on

23  that.

24         Then of course with respect to the codefendant, I

25  think that was particularly telling, that even though initially

1   he gave information about the involvement of Mr. Sosa Dominguez,

2   his later recantation of that, which he continued with on

3   Wednesday, that Mr. Sosa Dominguez didn't know anything about

4   it.  Again, I just don't think that that squares with the

5   evidence as well as with his prior statement.

6           So, you know, I understand it's a harsh sentence, but

7   I don't see any reason to provide or say that there is a basis

8   for the Court to depart downward, based on his efforts early on.

9   So that would be my position.

10          THE COURT:  Thank you, sir.

11          Mr. White.

12          MR. WHITE:  Thank you, Your Honor.  Judge, again, I

13  agree with Mr. Galyon that is a harsh sentence, and of course

14  looking at the 3553 factors, the Court does need to consider the

15  propriety of the sentence in light of all of the circumstances.

16          Obviously, Judge, Mr. Quesada has been involved in a

17  drug conspiracy of some length and some duration, and he stands

18  facing very, very serious punishment for that.  The punishment,

19  based on the Court's findings of his testimony Wednesday and

20  today, has increased that punishment from a sentence roughly 32

21  years low end of the guideline range to life in prison.  I

22  submit, Your Honor, that enhancement is disproportionate to the

23  actual conduct which resulted, in light of all of the factors.

24          Judge, I would like to call your attention to some

25  more positive aspects of the presentence report.  Mr. Quesada

1   came to this country about ten years ago and he came here not

2   involved in a drug conspiracy, to become involved in a drug

3   conspiracy.  He's hardworking.  You can see he worked for five

4   years at Pegram West, worked at other businesses, construction,

5   restaurant industries and ended up owning his own club with

6   another gentleman at the time this conduct started, whether

7   there is a relationship there, Judge, I don't know, but he has

8   always been hardworking.

9         He has four children.  He has strong support in the

10  community.  His wife is here.  He was separated from his wife at

11  the time of this incident.  They have reconciled and come

12  together in part because of this adversity he's been facing.  He

13  has close friends in the community, in the business community.

14  As well as helping him get started, they were here Wednesday.

15  They are here today.  His children are here and, Judge, you

16  certainly recall when he was testifying, and I insensitively

17  asked him to identify his family members here, he became

18  emotional, walked off the stand, literally couldn't finish that

19  answer.  Judge, that's indicative of what I would characterize

20  as, in my personal experience, perhaps the largest disparity

21  between offense conduct and the person I've come to know sitting

22  next to me.  It is remarkable.

23        These people are loving, supportive, caring, came

24  forward to see me on a regular basis.  We've become friends

25  almost  -- we would be friends, trying to establish a

1    professional relationship, keeping it such, same with

2    Mr. Quesada.

3              He did, again, provide as much assistance as I think

4    he could.  We would contend the main actor in this conspiracy

5    escaped that day.  Mr. Quesada knew there was no way that he

6    could make contact with him, in light of the fact that he was

7    apprehended, and that was a given and that, again, went through

8    and through.  Should he be apprehended, Mr. Quesada would come

9    forward and would -- he would hopefully have a chance to address

10   that at another time.

11             Judge, to sentence this 35 year old young man to life

12   is obviously what the guidelines call for, and this is serious

13   conduct.  I would urge Your Honor, however, to fashion a

14   sentence more along the lines of the original recommendation in

15   the presentence report, or even less, Judge, because putting

16   this man -- Judge, putting this man on probation would probably

17   be sufficient punishment, the way he's conducted himself and the

18   way this has impacted his family.  Obviously I wouldn't suggest

19   that the Court do that with any sort of credible fashion, but to

20   sentence him to life, Judge, is simply way, way more than is

21   necessary to punish this guy.

22             THE COURT:  Thank you, Mr. White.

23             Mr. Quesada, I would be glad to hear anything that you

24   would like to say at this time.

25             THE DEFENDANT:  Yes.

1        THE COURT:  Is there anything that you would like to

2  say?

3        THE DEFENDANT:  I would like to tell you everything

4  from the beginning to see if you can understand it.

5        THE COURT:  Okay.

6        THE DEFENDANT:  When I was stopped, I stopped.  When

7  the police stopped me, in a span of 30 seconds, Arlay told me

8  they want to arrest me.  He took out the gun and he had it in

9  his hand.  He said, hurry, press, you know, start running fast

10  and don't stop, and that's what I did.  Driving fast.

11        During that time that we were driving fast, I told him

12  to get out of the car.  He said, no, they are going to arrest

13  me.  So Amado Sosa said if you don't stop -- stop, because I

14  want to get out, and he had the gun in his hand and he said

15  nobody stops, because they are going to arrest me.

16        During that time was when we had the crash and he

17  dropped the gun and I took it because I wanted to throw it out,

18  and I knew he had a backpack and I only saw that.

19        So when we crashed, we started running and I took the

20  gun because I thought there was nothing else, and I wanted to

21  get that gun out of the car.  When I started running, I did hide

22  behind the van.  When I hid behind the van, I had not seen the

23  woman.  She did see me and that's when she screamed.  I had not

24  pointed the gun at her or anything, and at that moment, I said,

25  The police is coming, and I started running again.

1          The only thing I did was to run, run.  I never pointed

2     the gun at the policeman.  With Mr. Williams, I did tell him the

3     money that was in the truck, because Arlay had told me that, but

4     I never said anything about something being in the trailer.  It

5     is possible that he's confusing the trailer and the truck.

6     Everything I told him has been recorded and he can listen to it.

7     He recorded everything and he could show it, present it, the

8     recording.

9          THE COURT:  Is there anything else that you would like

10    to say?

11         THE DEFENDANT:  I'm just -- I feel a little

12    overwhelmed, and I can't think of anything else to say.

13         THE COURT:  Well, would you like additional time?

14    Would you like for us to take a break?

15         THE DEFENDANT:  No.  I'm fine.

16         THE COURT:  I hear what you say.  It's difficult to

17    believe that version as you describe it, that somebody who would

18    threaten you with a firearm would just leave it in the truck

19    when it crashed, and that you, who had been threatened, would

20    then pick it up for the purpose of doing something else with it,

21    and then the other people would misperceive your actions as they

22    did.

23         THE DEFENDANT:  I'm sorry, I didn't say that Arlay was

24    threatening me with the gun.  He just had it in his hand and he

25    just said hurry up, because they want to arrest me.

1            THE COURT:  In examining the 3553(a) factors, I really

2       do not find any that make me feel a sentence less than the

3       advisory guideline range would be appropriate.  I wish I did.

4       There is nothing about imposing a life sentence that I find

5       attractive or something that I want to do, but it is determined

6       in this case, that Mr. Quesada be committed to the custody of

7       the Bureau of Prisons for the period of his natural life under

8       Count One.  While it sounds certainly inconsistent, a period of

9       60 months to run consecutively under Count Three, with a period

10      of supervised release of five years under Count One, to run

11      concurrently with three years under Count Three, with the

12      special condition, should you be deported following release,

13      should you be released from the Bureau of Prisons, Mr. Quesada,

14      you may not re-enter the United States during that period

15      without first getting permission from the Secretary of Homeland

16      Security to do so, to ever come back, even after that five year

17      period, would subject you to prosecution under a different law

18      of the United States, which says once a person has been

19      deported, they may not come back without getting permission, and

20      that statute makes it a more serious offense for somebody who

21      has been deported after being found guilty of what is known as

22      an aggravated felony.  A drug offense such as this would be an

23      aggravated felony, so there would be a stiff penalty that you

24      would be subjected to if you came back at any time, but if you

25      came back within that five year period of supervised release,

1   then there would be two different periods of imprisonment that

2   you would be facing, which you could not serve together.  You

3   would have to serve one and finish service of that before you

4   could begin service of the other.

5         It is determined that a fine would work an undue

6   hardship, certainly in view of the sentence that was imposed.

7         The $200 special assessment may be paid through the

8   financial responsibility unit of the prison facility where you

9   are sent to serve your time.

10         MR. WHITE:  I have that.  We can take care of that

11   today.

12         THE COURT:  You, of course, have the right to appeal.

13   An appeal would have to be filed within ten days of the time

14   judgment is entered.  If not, you would waive your right to

15   appeal, so talk with Mr. White, and he will be glad to file that

16   notice on your behalf.  You will do that?

17         MR. WHITE:  Of course, Your Honor.

18         THE COURT:  With regard to a destruction order?  Since

19   Mr. Quesada claims that was not his firearm, would there be any

20   objection to it being destroyed?

21         MR. WHITE:  No standing to make such an objection,

22   Your Honor.

23         THE COURT:  So at the conclusion of the period for

24   appeals, it is ordered that insofar as Mr. Quesada is concerned,

25   that he makes no claim either to the firearm or the drugs and

1  they may be destroyed insofar as they are not being held for

2  evidence or as property of someone.

3          Thank you, Mr. White.

4          MR. WHITE:  Thank you, Your Honor.  In light of the

5  other issues we discussed, I don't know if I moved to dismiss

6  Count Two.  I will make that motion, if I haven't already done

7  so.

8          THE COURT:  Count Two is dismissed.

9          Do you have anything further, Mr. Galyon?

10          MR. GALYON:  I think the only other thing would be a

11  request as to destruction of the drugs, in addition to the

12  firearms.

13          THE COURT:  I included that with the firearms.

14          MR. GALYON:  There was the one firearm that was,

15  "his," and I wanted to make sure we got a destruction order as

16  to that.  There were two SKS's that were found beside the Titan.

17  I would request as to all of the firearms, that those be

18  destroyed at the end of the appellate period.

19          THE COURT:  Is there an objection, Mr. White,

20  Mr. Quesada, with regard to the destruction order with regard to

21  any of the firearms?

22          MR. WHITE:  No, Your Honor.

23          THE COURT:  You agree with that, Mr. Quesada?

24          THE DEFENDANT:  Uh-huh.

25          THE COURT:  The destruction order will include the two

1    SKS rifles, the 25 caliber pistol and the 38.

2              Thank you.

3              MR. WHITE:   Thank you.

4              (This matter was concluded at 10:12 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3           I, J. CALHOUN, RPR, United States District Court

4     Reporter for the Middle District of North Carolina, DO HEREBY

5     CERTIFY:

6

7           That the foregoing is a true and correct transcript of

8     the proceedings had in the within-entitled action; that I

9     reported the same to typewriting through the use of

10    Computer-Aided Transcription.

11

12          THIS TRANSCRIPT CERTIFICATION IS VOID, IF THE SIGNATURE

13    IS NOT ORIGINALLY SIGNED BY THE COURT REPORTER WHO REPORTED

14    THIS MATTER.

15

16

17    Date:  7/10/08              /s/ J. Calhoun
                                  J. Calhoun, RPR
18                                Official Court Reporter

19

20

21

22

23

24

25